762 F.2d 1013
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES OF AMERICA, PLAINTIFF-APPELLEE,
v.
SYLVESTER SEAL MURRAY ANDRE DIGGS, MICHAEL JENKINS, AND
DELOS FULWYLIE, DEFENDANTS-APPELLANTS.
 NO. 83-1441, 83-1537, 83-1594, 83-1617, 83-1618
 United States Court of Appeals, Sixth Circuit.
 4/19/85
 
 ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN
 Before: ENGEL, KRUPANSKY, and WELLFORD, Circuit Judges.
 WELLFORD, Circuit Judge.
 
 
 1
 On December 6, 1982, the defendants herein were among the forty-one persons indicted by a federal grand jury in Michigan for conspiracy to distribute and possess with intent to distribute quantities of heroin and cocaine. Various co-defendants were also charged with substantive violations. After preliminary undercover investigation, the government used wiretap recordings to make the charges against the defendants.
 
 
 2
 Prior to trial, 31 co-defendants entered pleas of guilty. One of the above-named defendants, Diggs, contends as his only issue on appeal that District Court Judge Ralph B. Guy abused judicial discretion in not allowing him to withdraw what he claimed to be a 'hasty' guilty plea.
 
 
 3
 The other above-named defendants were convicted at trial in the spring of 1983. Defendant Fulwylie was convicted on two substantive counts of drug distribution but not on the conspiracy charge. Fulwylie contends that his conviction on the substantive charge was prejudiced by the district court's failure to sever it from the conspiracy charge.
 
 
 4
 The lead defendant, Murray, was convicted of conspiracy and a number of substantive violations. Murray challenges the sufficiency of the evidence and argues that major portions of evidence should have been suppressed on Fourth Amendment privacy grounds. Defendant Jenkins also challenges his conspiracy conviction by arguing for suppression of wiretap evidence on the same grounds asserted by Murray.
 
 
 5
 I. Murray.
 
 
 6
 Lead defendant Sylvester Seal Murray raises a number of issues challenging his conviction for conspiracy (21 U.S.C. Sec. 846), substantive drug violations (21 U.S.C. 841(a)(1)), unlawful use of a communication facility (21 U.S.C. Sec. 843(b)), and engaging with others in a continuing criminal enterprise (21 U.S.C. Sec. 848).
 
 
 7
 Murray mounts his most vigorous attack against the district court's decision not to suppress evidence from wiretaps and searches conducted by the government in the Detroit city area.
 
 
 8
 The Wiretap Evidence.
 
 
 9
 On March 11, 1982, Judge Ralph B. Freeman ordered the first interception of phone communications on the phones of two other suspects in the conspiracy (Melvin Davenport and John Thomas). On April 20, 1982, Judge Guy ordered the wiretapping of defendant Murray's residence. On May 14, Judge Guy also authorized the wiretap of an apartment used by Murray and others in the conspiracy (24-1 Jeffersonian Apartments). One more wiretap of a residence was subsequently authorized by Judge Robert E. DeMascio on September 8, 1982.
 
 
 10
 Murray argues that a) the government failed to demonstrate investigative necessity in requesting the first wiretap authorization; b) evidence gained from the subsequent wiretaps therefore was fruit of the poisonous tree as well as unnecessary; and c) Judge Guy should have disqualified himself from ruling on the suppression motion because he authorized one of the wiretaps and conducted a hearing on its validity.
 
 
 11
 A government request for a wiretap order must reasonably demonstrate to a judge that 'normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous.' 18 U.S.C. Secs. 2518(3)(c). The issuing judge enjoys considerable discretion, however, in making a practical and common sense judgment about the sufficiency of the government's showing. United States v. Landmesser, 553 F.2d 17 (6th Cir. 1977).
 
 
 12
 Murray argues that the wiretapping was not necessary because the government was already enjoying great success in undercover infiltration of the drug network. The district court found that tapping into the nerve center of the network was necessary in order to establish the full scope of this extensive operation. We find that the district court did not abuse its discretion in this regard. See, e.g., United States v. Woods, 544 F.2d 242, 257 (6th Cir. 1976) (even significant opportunities for undercover infiltration would still not alleviate 'difficulty in learning all the complex details of the widespread [drug] organization, and its aiders and abettors.'). The subsequent wiretaps therefore were not poisonous fruit because the initial wiretap was not a poisonous search and seizure. See Woods, supra. We find no merit in defendants' argument in this respect.
 
 
 13
 The alternative argument that the subsequent wiretaps were unnecessary also fails to persuade us. The first and each successive wiretapping period uncovered communication indicating new dimensions to the conspiracy. The issuing judges exercised reasonable discretion after the government's showing of the need for more wiretapping to discover the various members of the drug ring.
 
 
 14
 Defendant Murray finally attempts to question the propriety of Judge Guy's ruling on the suppression motion in respect to the two wiretaps that he authorized. A judge is supposed to disqualify himself under 28 U.S.C. Sec. 455 in a proceeding if 'his impartiality might reasonably be questioned.' See Roberts v. Bailar, 625 F.2d 125 (6th Cir. 1980). Knowledge accquired in the course of earlier participation in the same trial is usually not sufficient grounds for a judge's recusal. See Southerland v. Irons, 628 F.2d 978, 980 (6th Cir. 1980).
 
 
 15
 The frequent recusal of judges in such situations could lead to serious procedural headaches for the federal court system. Such a practice might even encourage an unjust form of judge-shopping. Prosecutors might select a trial judge by presenting preliminary wiretap and search authorization requests to certain other district judges in order to disqualify them from trying the case. In this case two other judges ruled similar evidence sufficient for the wiretaps in the investigation. We find no merit to the argument that Judge Guy erred by not disqualifying himself in regard to the suppression motion.
 
 
 16
 The Physical Searches and Seizures.
 
 
 17
 Federal agents also executed a search warrant in two residences at the Jeffersonian Apartments on May 18, 1982. In this search government agents seized large quantities of heroin, cocaine, narcotics paraphernalia, relevant papers and business cards, as well as sums of cash. On June 16, 1982 and December 7, 1982, government agents executed search warrants at 18706 Tracey in Detroit. During the first Tracey search, agents found defendant Murray with drug paraphernalia and relevant drug-related business papers. Soon before trial, on March 16, 1983, the district court suppressed the use of jewelry and furs discovered at 18706 Tracey (and other searches not relevant here). At the same time, the court allowed use of the validly seized drug paraphenalia and other items included in the warrants.
 
 
 18
 One of defendant Murray's primary arguments on appeal is that this 'severance' or splitting of a search into valid and invalid portions encourages the kind of illicit 'general searches' feared by the Fourth Amendment founders. Yet we are not confronted here with a warrant that vaguely defines the scope of the search and thus arguably permitted a 'general search.' The indicriminately seized evidence was suppressed; only the particularly described evidence contemplated in the warrant was used as evidence at trial. Thus the key constitutional concern about a general or overly broad search--that the government will be able to search for and use all evidence possibly incriminating an individual--is simply not relevant here. See e.g., United States v. Giresi, 488 F. Supp. 445 (D.N.J. 1980), aff'd mem, 642 F.2d 444 (3d Cir. 1981), cert. denied, 452 U.S. 939 (1981).
 
 
 19
 Defendant Murray also asserts that the government's affidavit submitted for the first Tracey search warrant in June 1982 recited untrue information and thus invalidated probable cause for the search. Judge Guy held a preliminary hearing on the truthfulness of the affidavit as required under Franks v. Delaware, 438 U.S. 154 (1978). Government agents testified to the truthfulness of their key affidavit recitation. This concerned what an apparent drug courier in the conspiracy told them after being stopped coming out of the Tracey residence. At the hearing the individual contended that he acknowledged carrying a satchel filled with money but not the presence of drugs at the Tracey residence. After examination of the preliminary hearing record, we find no grounds for reversing the trial judge's decision as 'clearly erroneous.' United States v. Jabara, 644 F.2d 574, 577 (6th Cir. 1981).
 
 
 20
 Defendant also alleges that a second search of the Tracey residence in December 1982 should have been ruled invalid as fruit of the poisonous tree and also stale in time. Thus the evidence gained in this search should also be suppressed. However, since we have upheld the relevant portion of the Tracy 1 search the Tracey 2 search in December 1982 cannot now be deemed tainted by any invalidity traceable to Tracey 1. Murray has also failed to present a convincing case on the staleness claim. This court's review of the record does not establish grounds for reversing the judicial authorization granted below. The government, moreover, asserts that none of the evidence found in this second search was actually used at trial. And defendant Murray has completely failed to demonstrate the prejudicial use of this evidence.
 
 
 21
 Defendant Murray similarly argues for the lack of probable cause in the Jeffersonian apartment search, which turned up sizeable amounts of drugs and drug paraphenalia. We find more than sufficient evidence from the wiretap conversations and undercover investigation to est blish probable cause. We also refuse to question the trial court's ruling that Murray had no standing to challenge the searches because he had not credibly established his live-in access and resulting 'reasonable expectation of privacy' in the Jeffersonian apartment areas. See e.g., Rakas v. Illinois, 439 U.S. 128 (1978).
 
 
 22
 Defendant Murray finally argues that reversible error was somehow committed in the trial court's refusal to order return of illegally seized property in the searches that was subsequently levied by the IRS. We find no merit whatever in this claim. The trial court suppressed the use of all illegally seized evidence. None of this property therefore played an evidentiary role at trial.
 
 
 23
 Challenges to Judge's Conduct at Trial and Sufficiency of Evidence.
 
 
 24
 Murray also alleges a disqualifying bias on the part of Judge Guy in his conduct of the trial. Besides making general allegations that Judge Guy took the government's side throughout the case, Murray specifically complains about the high bail set for him. Murray, however, was the main ringleader suspect, had indicated that he would flee rather than go to jail, and obviously had demonstrated access to large sums of money. Murray fails to demonstrate any basis for his charge that the judge was predisposed against him, or that he should have sought someone else to try the charges.
 
 
 25
 Murray next argues that there was insufficient evidence for his conviction under 21 U.S.C. Sec. 848 for participation in a continuing criminal enterprise. Murray insists the government has not proved three factual elements necessary for conviction: a) a series of Drug Control Act violations; b) his 'management' position in contact with five or more persons; c) his obtaining of substantial income from the activity.
 
 
 26
 We note first that great deference is due to jury's judgment about sufficiency of evidence. United States v. Luxenberg, 374 F.2d 241, 248 (6th Cir. 1967). The evidence also seems upon examination sufficient to establish all these requisite elements. In wiretapped conversation Murray bragged about the numerous people connected to his enterprise. There were more than enough guilty pleas and convictions connected to Murray's participation in the conspiracy and his management role therein. The government, moreover, did not have to prove that Murray was sole ringleader. United States v. Phillips, 664 F.2d 971, 1013 (5th Cir. 1981). The jury could reasonably infer the final element from the existence of Murray's unexplained substantial income and other circumstances pointing to his drug involvement.
 
 
 27
 Murray also argues that insufficient evidence existed for his conviction of aiding and abetting distribution of heroin by courier Melvin Davenport on March 25, 1982. The record indicates that a big heroin deal planned between Davenport and an undercover agent broke down because of a dispute about the transaction. The record also indicates, however, that the courier distributed earlier that day a sufficient heroin sample to the undercover agent. A phone conversation between Murray and the courier was recorded in which they discussed going ahead with the drug distribution. The undercover agent testified that he was actually given a quite sizeable amount of heroin but returned it after the dispute developed. There are sufficient facts for the jury to infer Murray's aiding and abetting of Davenport's distribution on that day.
 
 
 28
 Murray next argues that there was not sufficient evidence for his conviction of unlawful use of a communications facility under 21 U.S.C. Sec. 843(b). No specific drug distribution, however, had to be established by the government for the jury to infer an unlawful use of telephone communication. United States v. Pierosazio, 578 F.2d 48 (3d Cir. 1978). And the wiretap evidence overwhelmingly supports the inference that Murray unlawfully used phones to further drug conspiracy aims.
 
 
 29
 Murray finally argues that trial judge should have dismissed charge of aiding and abetting drug distribution by Darryl Young. Young was apparently found hiding near the premises after drugs were discovered in a Jeffersonian Apartment search. Moreover, recorded conversations between Young and Murray sufficiently demonstrate their drug-linked connections. There was sufficient evidence supporting the decision not to dismiss.
 
 
 30
 II. Jenkins.
 
 
 31
 Defendant Jenkins makes the same arguments against the wiretap orders launched by Murray. They are rejected for the same reasons as stated above.
 
 
 32
 As a lesser figure in the conspiracy, Jenkins' identity apparently was not known at the time of the wiretap. Yet there is no legal significance in this distinction. The government does not have to show exhaustion, futility, or danger of other investigative procedures as specifically applied to particular individuals in the conspiracy. See, e.g., United States v. Baker, 589 F.2d 1008, 1011 (9th Cir. 1978).
 
 
 33
 Jenkins also argues that the government failed to prove his knowing or willing participation in the conspiracy. Yet his knowing participation can unquestionably be inferred from the wiretap conversations and the evidence validly seized in various searches.
 
 
 34
 III. FULWYLIE.
 
 
 35
 Fulwylie (alias, Pete) stood trial with lead defendant Murray, Jenkins, and another person whose case is not now on appeal. His several motions for severance were rejected by the trial court.
 
 
 36
 Fulwylie was convicted for being directly involved in drug transactions involving government special agents. The government's main evidence against him on the conspiracy counts were some telephone conversations between defendants Murray and others about his drug dealings. The thrust of his argument is that the guilty verdict against him for the substantive violation of drug distribution cannot stand in light of his acquittal on the conspiracy charge. The common test for retroactive misjoinder, however, is presented in the following question: 'In sum, can the jury keep separate the evidence that is relevant to each defendant and render a fair and impartial verdict as to him? If so, though the task may be difficult, severance should not be granted.' United States v. Martino, 648 F.2d 367, 385 (5th Cir. 1981), citing Peterson v. United States, 344 F.2d 419, 422 (5th Cir. 1965) (emphasis added). The jury's split verdict on the charges against Fulwylie suggests that it had indeed been able to separate the substantive charge of drug distribution against him from the conspiracy counts against everyone.
 
 
 37
 A defendant, moreover, has the burden of establishing 'compelling prejudice' in the trial court's decision not to sever his case. United States v. Warner, 690 F.2d 545, 554 (1982). It is not sufficient for a defendant to show that the evidence against him is not as substantial in comparison to the evidence against other defendants. United States v. Mayes, 512 F.2d 637, 647 (6th Cir.), cert. denied, 422 U.S. 1008 (1975). The defendant also does not need to know the full scale of the conspiracy to be charged with the offense. United States v. Shermetaro, 625 F.2d 104, 108 (6th Cir. 1980).
 
 
 38
 Jenkins, nevertheless, suggests that the government's only possible evidence was that of single isolated acts of distribution. This argument for severance is rebutted by United States v. Grunsfeld, 558 F.2d 1231 (6th Cir. 1977), cert. denied, 434 U.S. 1016 (1978). Defendants there similarly argued that their alleged criminal activities were limited to single and isolated incidents. They also suggested that the voluminous quantity of evidence presented in the evidence was unrelated to them and thus prejudicial. We follow Grunsfeld in rejecting this argument, because the defendant simply cannot show 'any specific instances where the jury might have been confused by the scope of the proofs or was unable to limit evidence to only one defendant when necessary.' 558 F.2d at 1237.
 
 
 39
 IV. Diggs.
 
 
 40
 Diggs appeals from the district court's denial of his pro se motion to withdraw a guilty plea before being sentenced.
 
 
 41
 It is undisputed that Diggs voluntarily gave up his status as a fugitive in order to enter his guilty plea. In turning himself over to the authorities, he was apparently responding to a newspaper article stating that the authorities were soon to cancel their willingness to accept plea bargains from fugitives in this drug case.
 
 
 42
 Diggs turned himself in at the end of the plea-bargaining period. He received court-appointed counsel and Judge Guy questioned Diggs fully about the voluntariness of his plea in court on April 7, 1984. In exchange for a guilty plea, the government promised Diggs would not be called as a witness in other related trials and that his sentence would be no more than 3 years. Diggs does not explicitly dispute any of these facts or now plead his innocence. He does not even say that his plea was involuntary. Diggs instead only characterizes his decision as 'hasty' and given when he was 'very scared.' Diggs also acknowledges that a hearing was held to consider his motion on June 28, 1983. He is thus challenging only the substantive grounds for the denial. Cf. United States v. Coure, 632 F.2d 665, 666 (6th Cir. 1980).
 
 
 43
 This court has stated that '[w]ithdrawal prior to sentencing is not an absolute right, rather it is within the discretion of the trial court.' Coure, supra, 632 F.2d at 666. A key consideration in evaluating withdrawal motions should be the possible prejudice to be suffered by the prosecution. Requisite prejudice would certainly seem to exist in this situation where the prosecution explicitly gave up a stiffer sentence and the right to call him as a witness in other drug-related cases.
 
 
 44
 This court, therefore, affirms the convictions of all defendants as to each issue raised on appeal.